IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| MOHAMMAD IRFAN SHAMI, | C/A No. 3:15-cv-03843-CMC |
| Plaintiff, | |
| v. | Opinion and Order Granting Motion for Summary Judgment |
| THE KROGER COMPANY AND KAZ USA, INC., | |
| Defendants. | |

Through this action, Plaintiff, Mohammad Irfan Shami ("Shami"), seeks damages for injuries allegedly suffered while using a heating pad manufactured by Defendant Kaz USA, Inc. ("Kaz"). Complaint ¶¶ 6, 8-10. Shami alleges he purchased the heating pad from Defendant The Kroger Company ("Kroger") on January 6, 2013, and was burned while using the heating pad on January 9, 2013. Complaint ¶¶ 9, 10.

Defendants seek summary judgment on two grounds. First, they argue Shami's claims are foreclosed by his deposition testimony, which places the date of purchase (January 6-13, 2013) after the date of injury (December 17-18, 2012). Second, they argue Shami has failed to adduce evidence the heating pad was defective or otherwise unreasonably dangerous. For reasons set forth below, the court grants the motion on both grounds.

**STANDARD**

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). The

party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, the non-moving party cannot create a genuine issue of material fact by presenting his or her own conflicting versions of events. *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.").

Rule 56(c)(1) provides as follows:

> (1)  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers or other materials; or
> >
> > (b)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

## DISCUSSION

**I.      Shami's Claims Are Foreclosed by his Deposition Testimony**

**Shami's Deposition Testimony and Related Evidence.**  During his deposition, Shami testified he purchased the heating pad between January 10 and 13, 2013. Shami dep. at 29-30 (ECF No. 38-2). He also identified a January 6, 2013 receipt as likely the receipt for the purchase, though he expressed some uncertainty based on the price. Shami dep. at 28, 29, 33, 34. There is no other evidence of the purchase date. Thus, while the precise date of purchase is unclear, the

proffered evidence places the purchase between January 6 and 13, 2013. Shami also testified he had previously used a heating pad owned by his mother, though no dates were indicated as to that use. Shami dep. at 30.

Shami testified he used the heating pad at night while sleeping and was burned during such use the evening preceding December 18, 2012. Shami dep. at 37-41 (referring to month and day), 42-43 (identifying year as 2012). The following morning (December 18) his roommate "saw [Shami's] arm and [his] face and got scared, so he took [Shami] to the [emergency room]." *Id.* at 38; *see also id.* at 41 (denying he used the heating pad after December 18, 2012).

While in the emergency room, Shami took cell-phone video of his injuries, which he gave to his attorney. *Id.* at 37, 50-52; *see also id.* at 39 (stating he "would go by the video" to show his injuries). A screenshot of the metadata linked to that video reflects a "last modified" date of December 23, 2012. ECF No. 38-4 (Affidavit of J. Michael Jordan).

**Defendants' First Argument for Summary Judgment.** Defendants argue the sequence of events established by Shami's deposition testimony precludes Shami's claim because it establishes Shami purchased the Kaz heating pad between January 6 and 13, 2013, *after* he alleges he suffered burns from a heating pad on the evening preceding December 18, 2012. Defendants offer the cell-phone video metadata as documentary evidence bolstering this sequence of events (and inconsistent with any claim the injury occurred after December 23, 2012).

**Shami Opposition Argument.** Shami responds that Defendants are (1) improperly seeking to resolve an issue of credibility on summary judgment; and (2) defense counsel's affidavit offers improper testimony by counsel. ECF No. 49 at 1, 2. As to the first point, Shami notes he suffers certain psychiatric conditions (depression and schizoaffective and anxiety disorders) and was taking various medications at the time of his deposition. *Id.* at 2 (citing Shami dep. at 6, 7,

3

18-21). He asserts he was not asked if either the health conditions or medications "resulted in memory problems or impacted his ability to give truthful and/or accurate answers[.]" *Id.* at 2 n.1.

Shami also proffers medical records from two visits to Lexington Medical Center on January 9 and 30, 2013, which he argues support his allegation he was injured on or about January 9, 2013. *Id.* at 3-4 (citing Ex. B). He characterizes the record of his January 9, 2013 visit as showing he was "admitted . . . on January 9, 2013 at 3:00 a.m., complaining of having woken up with red lesions to his left forearm also redness and numbness to his face" and was "discharged that evening with a prescription for antibiotics and topical cream to treat his arm." *Id.* at 3, 4 (citing Ex. B).[1] Shami characterizes the record of his January 30, 2013 visit as showing he returned to the Emergency Department "for follow-up care for a burn on his left forearm 'about 11 days ago[.]'" The physician noted there was "an area on the left forearm 'consistent with the healing of a 2nd degree burn' which was 'healing well.'" *Id.* at 4 (citing Ex. B).

Despite disavowing his deposition testimony as to the date of his injury, Plaintiff relies on the same deposition for various propositions including the following: (1) he received a skin graft for the burn injury in February 2013 at Doctors Hospital in August, Georgia; and (2) he saw a neurologist in mid-January and, thereafter, went to the urgent care center (presumably referring to his January 30, 2013 visit to Lexington Medical Center Urgent Care). *Id.* at 4, 5 (quoting Shami dep at 37, 38, 48, 49). Shami proffers no medical records relating to the skin graft or neurologist visits). He also, somewhat inexplicably, cites his deposition testimony for the proposition he made

---

[1] Shami cites the thirteen pages of medical records of these two visits only by generic reference to "Exhibit B." His only quotation is from the record of his January 30, 2013 visit.

4

a video the morning he woke up after getting burned, which was the evening before "December 18." *Id.* at 4, 5 (citing Shami dep. at 37, 39).

Shami does not offer any affidavit or declaration seeking to clarify the date he suffered the burn. Neither does he offer any support for his claim he was confused as to the date during his deposition.

**Defendants' Reply.** On reply, Defendants note Plaintiff's position is, essentially, that his own definitive testimony should be ignored in favor of medical records that *could* be read to suggest some other sequence of events. ECF No. 50 at 1. They contest the implication Shami's "medical condition and medications are reasons to doubt his testimony" given what they characterize as his affirmative response to a query whether he felt competent to testify truthfully in view of his medications. *Id.* at 3.[2] Defendants also note Shami waived the right to review his deposition testimony and has offered no affidavit "stating that his sworn testimony was inaccurate, false or confused as a result of his medications." *Id.* at 3.

**Discussion.** The first difficulty with Shami's opposition is it attempts to create a genuine issue of material fact by presenting evidence he claims contradicts his own testimony as to the sequence of events (date of purchase and injury). Such an approach conflicts with at least the spirit, if not the letter of the rule that a party may not create a genuine issue of material fact by presenting competing versions of his own testimony. *See Barwick*, 736 F.2d at 960; *see also Rohrbough v. Wyeth Laboratories, Inc.*, 916 F.2d 970, 974-77 (4th Cir. 1990) (applying same rule

---

[2] The cited query and response were as follows:
    Q:    You brought your medications with you and the first thing I want to ask you is, [d]o you feel that you are competent to truthfully answer my questions today:
    A:    Yes, I do.
Shami dep at 5.

5

to conflict between expert's deposition and affidavit testimony). It also ignores the relevant standard which requires the court to credit the non-moving party's version of events for purposes of summary judgment. In this case, the non-moving party's version of events is set out in his unequivocal deposition testimony. Allowing Shami to rely on other evidence that arguably contradicts that testimony is particularly inappropriate where, as here, he has failed to present anything more than speculation he suffered impairments at the time of his deposition that resulted in inaccurate testimony.

It is also significant that Shami was represented by counsel at his deposition. As noted above, despite having the opportunity to question Shami at the conclusion of the deposition, his attorney elected not to do so, thereby waiving an immediate opportunity to address any concerns as to competency, confusion, or inaccuracies. *See* Shami dep. at 61 (declining to ask any questions). By waiving the right to read and sign the transcript, Shami waived a second opportunity to offer timely clarification. *Id.* (noting witness was advised of his right to read and sign the transcript but waived that right). It is only in his response to summary judgment, offered after the close of discovery and over two months after his deposition, that Shami suggests either concerns as to competency or the accuracy of his testimony. Even then, Shami offers no affidavit or other testimony directly on the issues of competency, confusion, or even the actual sequence of events. What is offered is merely counsel's argument that Shami's conditions and medications *might* have caused confusion and medical records that counsel argues suggest a different sequence of events.

The second difficulty with Shami's arguments is the medical records on which he relies are not necessarily inconsistent with his deposition testimony. Most critically, the medical records of his January 9, 2013 visit to the emergency room, discussed below, make no mention of a recent

6

burn. They, instead, refer to what was apparently a skin infection on his left forearm. While the January 30, 2013 records of his visit to an urgent care center do refer to a burn suffered at some earlier time, the dates suggested by Shami's self-reported history place the injury after January 9, 2013. The actual medical findings in the later records support only the conclusion that Shami suffered a burn at some earlier time that was healing well by January 30, 2013. Thus, while these records could be consistent with Shami's current claims (or, more accurately, with a claim he suffered a burn after January 9 but up to two weeks before January 30), they are not inconsistent with his deposition testimony. Thus, they provide no basis on which to disregard that testimony in favor of inferences that might be drawn from medical records.

**January 9, 2013 Medical Records.** The records of Shami's January 9, 2013 visit to the emergency room indicate Shami presented with two concerns: a persistent sore throat and a "swelling left forearm 2 areas no recent bites or injections." ECF No. 49-2 at 1 (report of physical examination). While there are multiple references to concerns relating to Shami's left forearm, none indicate a recent burn. *Id.* at 1-7. They, instead, suggest an infection of some form. *Id.* At one point during this visit, Shami reported he "was unsure what happened" to cause the red area on his left arm. ECF No. 49-2 at 7.[3]

---

[3] The triage form indicates Shami arrived at "15:07" (3:07 p.m.) on January 9, 2013. ECF No. 49-2 at 8 at 8. At that time, Shami reported he "woke up at 1400 with left arm weakness and red lesion to left fa, also redness and numbness to face, also sore throat and congestion." *Id.*

A report of a physical examination conducted at 15:36 states, under the "HEENT" heading, Shami had a "red area left cheek," and under the "Skin" heading, he had "2 areas left forearm red swelling." ECF 49-2 at 1. The diagnoses codes for the visit list five diagnoses: sore throat; diabetes mellitus, cellulitis, hyperglycemia, and chronic pain. *Id*. at 3.

Nursing notes at 15:45 indicate Shami complained of a sore throat. The nurse also noted "[r]ed area noted to L lower arm, *Pt states unsure what happened – c/o itching at this time*." *Id.* at 7 (emphasis added). At 15:50, the nurse noted "pt reports waking up this afternoon with redness,

In sum, the records of Shami's January 9, 2013 visit to the emergency room support the conclusion he sought treatment for pain, redness, itching and blisters to his left forearm and was "unsure what happened." *Id.* at 7.  There was no report of a burn and medical personnel did not note a finding of a burn.

**January 30, 2013 Medical Records.**  In contrast to the record of his January 9, 2013 emergency room visit, both the intake form and physician's note from Shami's January 30, 2013 visit to Lexington Medical Center Urgent Care in Irmo ("Irmo Urgent Care") indicate Shami had suffered a burn to his left forearm.  For example, the "History of Present Illness" on the intake form refers to a "thermal burn to left forearm x 2 weeks – nonhealing, some assoc[iated] distal numb[ness] and weak[ness] to hand, has been to EDs but not follow with wound specialist, wants letter from us stating that wound is not contagious[.]" *Id.* at 12.  The physician's note states Shami reported "a burn on his left forearm about 11 days ago." *Id.* at 10 (also stating patient had been "seen" for the burn, though when and where is not stated).  Thus, these notations suggest a burn received between January 16 and 19, which would be after the latest date Shami testified he purchased the Kaz heating pad, though after the January 9, 2013 emergency room visit, which he argues was on the day after he was burned.

---

swelling and numbness to the left fa" in addition to complaints of a scratchy throat. *Id.*  Notes of an 18:40 check indicate Shami's main complaint was "pain in L forearm" and he was "currently being treated for hyperglycemia with ivf and insulin, no fever, L forearm soft small vesicles lateral forearm, no induration." *Id*. at 2 (also noting possible concerns as to "msra and impetigo").

The next nurse's note referring to Shami's forearm was entered at 19:45, and states "Pt request to have LFA wrapped due to the redness and blisters, wrapped with gauze[.]" *Id.*  A note relating to discharge states he requested and was given information about his diagnosis of impetigo and left with a friend. *Id.* (20:13 note).  The "Primary Nurse Diagnosis" is listed as "Infection, Potential for R/T possible cellulitis" and "Primary Nurse Outcome" is listed as "Infection Minimized: pt given abx." *Id.*

8

The physician's note also states "the burn was on the mid forearm area. It apparently was caused by lying on a heating pad" and "[t]here is a 4x4 cm area of eschar on the left forearm consistent with a healing 2d degree burn," *Id.* at 10. The physician described the burn as "healing well" and indicated Shami requested and was given a note indicating he was not infectious. *Id.*

The records from Shami's January 30, 2013 visit to Irmo Urgent Care are *consistent with* a claim he suffered a burn from a heating pad sometime in January 2013. They do not, however, *require the conclusion* he suffered a burn during the critical period (after the Kaz heating pad was purchased from Kroger between January 6 and 13, 2013) or foreclose the possibility the burn was suffered in mid-December. The physician's notes of his observations indicate only that Shami suffered a burn at some point sufficiently prior to January 30, 2013 to be healing well by that date.

Any inference as to the date Shami was burned comes from Shami's statements to medical personnel. For present purposes, the court assumes these statements fall within a hearsay exception. *See* Fed. R. Evid. 803(4). There is, however, no reason to treat such statements more favorably than any other inconsistent statement by a non-moving party. *Barwick*, therefore, precludes Shami from relying on his statements to medical personnel to raise a genuine issue of material fact as to the date he was burned. Without inferences arising from Shami's own statements, the Irmo Urgent Care records raise only an inference that Shami suffered a burn at some point sufficiently prior to January 30, 2013, for the burns to be healing. This is not inconsistent with his deposition testimony.

In sum, even if documentary evidence such as medical records might, in some instances, allow a party to avoid the consequences of his own testimony (adverse to his claims), the evidence Shami proffers is insufficient for this purpose. This leaves him with his own testimony, which forecloses any possibility of causation given the sequence of events (injury predating purchase).

9

**Cell-Phone Video Metadata.** While not determinative, the metadata on the cell-phone video produced in discovery is also consistent with Shami's testimony he was burned in mid December 2012 and, consequently, bolsters the conclusion Shami suffered his burn before he purchased the Kaz heating pad in January 2013. Shami testified this video was taken in the emergency room on December 18, 2012, the morning after he was burned by the heating pad, and referred to that video as the best evidence of the appearance of his injuries. The metadata for the video reflects a last revised date of December 23, 2012. Thus, the metadata is consistent with injury occurring on or before December 23, 2012.

Shami challenges the propriety of defense counsel's affidavit, offered in support of this metadata, suggesting it is improper both because it offers testimony of counsel and because counsel's testimony is in the nature of expert opinion. The court disagrees. Counsel's affidavit provides only a foundation for documentary evidence. Specifically, it avers (1) Shami referred to a cell-phone video during his deposition, (2) his counsel had earlier provided a cell-phone video, and (3) an attached "screenshot of the metadata on the video [states] it was 'last modified' on December 23, 2012." The affidavit does not opine as to the import of the "last modified" date.

Shami offers nothing to cast any aspect of the foundation information into doubt. He does not, for example, suggest the metadata screenshot does not reflect the metadata for the video he took of his injuries. Neither does he offer an affidavit stating the metadata is inaccurate, much less explain why it might be inaccurate. Under these circumstances, there is no basis to exclude the metadata, which is, in any event, merely cumulative of Shami's own testimony.

**Conclusion as to First Argument.** Ultimately, the court concludes *Barwick* controls and Shami's deposition testimony precludes reliance on other evidence as to the sequence of events. Even if other evidence may overcome the *Barwick* rule in some instances, the evidence proffered

10

here does not support ignoring Shami's unequivocal and repeated deposition testimony as to the date of his injury. Defendants' motion for summary judgment is, therefore, granted on the first ground argued.

## II.     Insufficient Expert Testimony to Support Claim

**Expert Report.** Plaintiff identified one expert on the issue of liability, Bryan R. Durig, Ph.D., P.E. ("Dr. Durig") of Summit Engineering, L.L.P. ECF No. 31 at 1 (listing expert and referring to attached report).[4] Dr. Durig's attached report states he was retained to conduct "an engineering investigation of [] reported thermal burns received by Mr. Mohammad Shami while he was using a KAZ USA SoftHeat® heating pad." ECF No.31-1 at 3. It further states "[t]he purpose of this investigation has been to review available information to evaluate/test the operation of the subject KAZ USA heating pad." *Id.*

Dr. Durig describes the steps he took to investigate and test the heating pad. *Id.* at 4, 5. He notes temperatures reached 160 degrees Fahrenheit but came down to 140°F "for the majority of the testing" and explains "[t]he temperatures measured were below the maximum recommended temperatures for household pads in UL130." *Id.* at 5. He also notes the "pad shut off after 60 minutes of operation which is consistent with the owner's manual that was reviewed for the auto-shut off feature." *Id.* While he states there is a risk of burns at 140°F, and provides support for this statement, he does not state the product was defective because it could reach such a temperature. *Id.* at 6. Specifically as to the risk of burns at 140°F, he notes "the skin can withstand

---

[4] Shami also identified eighteen physicians as experts who are not required to provide a report. ECF No. 31 at 1-3. He indicated that each of these physicians would testify as to treatment provided to Shami.

temperatures up to 140F for 5 seconds before the skin is damaged ('complete necrosis of the epidermis')." *Id.* at 6 (source of quotation not provided).

Dr. Durig also notes multiple warnings in the literature provided with the heating pad. These include warnings against using the product while sleeping and the risk of burns regardless of the control setting and corresponding need to check skin frequently. *Id.* He also notes a warning against use of the heating pad by individuals with poor blood circulation or diabetes. *Id.*[5]

Dr. Durig concludes his description of his investigation as follows:

> With knowledge of the temperature-time combinations that can cause thermal burns to humans, *it is unclear at this time* why the subject . . . heating pad is designed and manufactured so that the heating pad can stay on for 60 minutes before the auto-off feature turns off the heating pad at an operating temperature that can cause thermal burns within 60 minutes. Controls are such that one could program the timer to be shorter with the higher heat settings and limit the continuous time of operation to below the thermal burn-temperature time curves available in the research material on Thermal Burns including ASTM C1055.

*Id.* (emphasis added).

The summary on the last page of Dr. Durig's report includes the same language. It also states:

> Based on a review of available information, the subject KAZ USA SoftHeat® heating pad was tested per UL 130. Although temperatures measured were below the maximum recommended by UL 130, operating time of the subject heating pad (60 minutes before auto-off feature turns off power) are sufficient to cause thermal burns to human skin. . . . Since discovery has been very limited, I expect to produce a Supplemental Report after discovery material has been provided and reviewed."

---

[5] Medical records indicate Shami suffered from diabetes. He testified he was burned when using the heating pad while sleeping. He did not, however, recall whether there were warnings included with the heating pad when he purchased it.

*Id.* at 7. No other opinions are offered in this report or in any supplemental report or testimony. Moreover, the report does not address the temperature setting at which Shami was utilizing the heating pad at the time of his injury. [6]

**Defendants' Argument.** Defendants argue Shami's claims fail because he has failed to produce expert testimony that the heating pad was negligently manufactured or otherwise unreasonably dangerous. ECF No. 38 at 6 (also noting defense expert found no defect).

**Shami's Response.** Shami responds that his expert's report supports a claim "the heating pad is defectively designed because it is capable of staying on for 60 minutes at temperatures that cause burns before the auto shut-off feature is activated." ECF No.49 at 11, 12. He asserts he has "presented evidence of an alternative design . . . , which would be to program the auto shut-off timer to be shorter with the higher heat settings and limit the continuous time of operation to below the thermal burn-temperature-time curves, as outlined in the research material on thermal burns including ASTM C1055." *Id.* at 12.

Shami also proffers a chart he describes as demonstrating the heating pad model at issue "has been the subject of numerous consumer lawsuits, incidents, and complaints. ECF No. 49 at 10, citing Ex. C (ECF No. 49-3). The chart is titled "Claims and Incidents Nationwide Wal-Mart Stores," covers the period May 23, 2007, through September 30, 2012, and mentions roughly eight claims of burns or fires involving the same or a similar model. Shami does not explain how this

---

[6] The expert report is dated July 21, 2016. ECF No. 38-5. It lists the Complaint and Answer as materials considered, but no other sources of allegations or facts. *Id.* at 5. The Complaint does not allege the setting at which the heating pad was used and is, in any event, unverified. Shami's deposition was taken on August 25, 2016, roughly a month after the date of the expert report. The deposition does not address the setting at which the heating pad was used. Neither does any other proffered evidence address this issue.

13

chart supports his claims or, more critically, how it supports or substitutes for expert opinion regarding a design defect.

**Defendants' Reply.**  On reply, Defendants note Dr. Durig's failure to identify a product defect.  ECF No. 50 at 4.  They characterize his suggestion of a modification as Dr. Durig "reflect[ing] on a heating pad that operates at a lower, unspecified, temperature, or one that shuts off at an unspecified time less than 60 minutes[.]"  *Id.*  Defendants argue this is insufficient to support a design defect claim because an expert must demonstrate proposed safety designs are both feasible and will not interfere with the product's utility.  *Id.* (citing, *e.g.*, *Urein v. Timesavers, Inc.*, 394 F.3d 1008 (8th Cir. 2005)).  Finally, Defendants note that ASTM C1055, on which Dr. Durig relies, contains the following disclaimer:  "It is beyond the scope of this guide to establish appropriate contact times and acceptable levels of injury for particular situations, or determine what surface temperature is 'safe.'"  *Id.* n.2 (citing http://www.astm.org/Standards/C1055.htm).

**Discussion.**  Neither Dr. Durig's expert report nor Shami's response to Defendants' summary judgment motion suggest any basis for finding the heating pad was defectively manufactured or the warnings inadequate.  He, instead, relies solely on a defective design theory.  It follows that Shami has abandoned his claims to the extent founded on any other theory of liability.

As to the design-defect theory, Shami notes South Carolina "has adopted the risk-utility test . . . under which plaintiff must prove an alternative feasible design."  ECF No. 49 (citing *Fisher v. Pelstring*, 817 F. Supp. 2d 791 (D.S.C. 2012).).  He argues Dr. Durig's report satisfies this requirement.  For reasons explained below, the court disagrees.

Dr. Durig's report states the product could have been designed to shut off in a shorter time when run at higher temperatures.  It offers no further detail, explanation, or risk-utility analysis.

14

For example, it does not address how quickly the heating pad should have shut off at any given temperature or how the particular shut-off time and temperature combinations would affect the utility of the product. The only time-temperature combination that might be inferred from the report would require a shut-off after five seconds when the pad is operated at the otherwise permissible temperature of 140°F, given Dr. Durig's reliance on a standard that indicates burns may occur at this temperature after five seconds. Such a combination would have an obvious impact on utility, yet no risk-utility analysis is offered. Thus, while Dr. Durig's testimony may suggest a possible useful design modification, it is too generally stated and lacks adequate explanation to support a design defect claim. *See generally Watson v. Ford Motor Co.*, 699 S.E.2d 169, 177 (S.C. 2010) (holding trial court erred in admitting expert testimony on design defect because expert did not explain how his proposed design could be incorporated into the subject system, did not offer any model comparison, and offered no evidence to support his conclusion the design was economically feasible); *Marchant v. Mitchell Distrib. Co.*, 240 S.E.2d 511, 514 (S.C. 1972) ("The fact that the injury occurred and the fact that the crane could have been more safe is not sufficient to support a finding that the crane was unreasonably dangerous."); *Holst v. KCI Konecranes Intern. Corp.*, 699 S.E.2d 715, 719, (S.C. Ct. App. 2010) (affirming summary judgment where plaintiff's experts failed to "conduct a risk-utility analysis regarding their proposed design alternative" and noting the need for such an analysis "to weigh the benefits of any new design against the costs and potentially adverse consequences of the design" (internal marks omitted)); *Rive v. Hitachi Const. Mach. Co., LTD*, 609 S.E.2d 565 (S.C. Ct. App. 2005) (applying *Marchant* in holding evidence the product "could have been made more safe" by installing a seat belt was "insufficient to support a finding" the product was defectively designed).

15

**CONCLUSION**

For the reasons set forth above, Defendants' motion for summary judgment is granted on both bases argued. The Clerk of Court shall enter judgment for Defendants.

IT IS SO ORDERED.

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
Senior United States District Judge

Columbia, South Carolina
November 30, 2016

16